There is no evidence showing that Defendant's actions against Mr. Ford were motivated by a desire to retaliate for filing the EEOC complaint (or to retaliate for anything else, for that matter), nor are there any inferences to be drawn which support such a finding. *See Canitia*, 903 F.2d at 1066. Simply, plaintiff has failed to establish that Defendant had a retaliatory motive." *Id.* There was no motive for the defendant to retaliate, as there was no discrimination charge for it to fear. The Plaintiffs implicitly recognize this by failing to pursue harassment or hostile work environment claims.

As the majority notes, our decision in *Hollins v. Atlantic Co.*, 188 F.3d 652 (6th Cir. 1999), holds that in order to establish an adverse employment action, a plaintiff must show more than merely "an alteration of job responsibilities." The record must indicate such actions as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* at 662. An increase in workload, such as the one pleaded here, would have to be more substantial and onerous than it appears on this record, and it would have to come only *after* the plaintiff's formal complaint of discrimination in order to constitute retaliation on the part of the employer. The facts in this record simply do not show that to be the case.

For the reasons stated in the district court's opinion, I would affirm the judgment entered by that court. I therefore respectfully dissent from the majority's decision to remand this case for trial. My position should not be taken as condonation of the treatment that the plaintiff received from his co-workers. Their racial animus is apparent, and it is as shameful as it is contemptible. But I do not believe that the record supports imputation of the same reprehensible attitude or offensive conduct to the plaintiff's employer.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0336P (6th Cir.)
File Name: 02a0336p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

GEORGE FORD; MARY A. FORD,
      *Plaintiffs-Appellants,*

      *v.*

GENERAL MOTORS CORPORATION,
      *Defendant-Appellee.*

No. 01-5060

Appeal from the United States District Court
for the Western District of Kentucky at Bowling Green.
No. 99-00048—Joseph H. McKinley, Jr., District Judge.

Submitted: June 11, 2002

Decided and Filed: September 27, 2002

Before: KEITH and DAUGHTREY, Circuit Judges;
MARBLEY, District Judge.

_____

[*] The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

———————————

**COUNSEL**

**ON BRIEF:**  Evan E. Taylor, LAW OFFICE OF EVAN TAYLOR, Owensboro, Kentucky, for Appellants. Jane Ann Himsel, WOODEN & McLAUGHLIN, Indianapolis, Indiana, for Appellee.

MARBLEY, D. J., delivered the opinion of the court, in which KEITH, J., joined. DAUGHTREY, J. (pp. 17-20), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

ALGENON L. MARBLEY, District Judge.  Plaintiffs-Appellants ("Plaintiffs") appeal the district court's order granting Defendant-Appellee's ("Defendant") motion for summary judgment on all of Plaintiffs' claims arising from the termination of George Ford's employment with the General Motors Corporation.  Plaintiffs assign error to the district court's failure to draw reasonable inferences to support their claims of (1) retaliation in violation of Title VII and the Kentucky Civil Rights Act, (2) intentional infliction of emotional distress, and (3) loss of consortium. Jurisdiction is proper pursuant to 28 U.S.C. § 1291.  For the following reasons, this Court **REVERSES** in part, **AFFIRMS** in part, and **REMANDS** the district court's grant of summary judgment.

**I.  BACKGROUND**

Plaintiff George Ford ("Ford"), an African-American, had worked for Defendant, the General Motors Corporation ("GM"), for over thirty years.  The remaining Plaintiff, Mary Ford, is George Ford's wife.  The last seventeen years of Ford's employment were spent at GM's Corvette Assembly

front of them.  There is nothing inappropriate about a company watching an employee, especially one who is having admitted difficulties performing his assigned duties.

Second, even assuming that Mr. Ford had demonstrated an adverse employment action, he has not shown that there was a causal connection between the filing of the EEOC complaint and the adverse employment action.  Mr. Ford "must establish that the decision complained about as retaliatory would not have been made 'but for' the protected status of the plaintiff." *Canitia [v. Yellow Freight Sys., Inc.* 903 F.2d 1064, 1068 (6th Cir. 1990)] (numerous citations omitted).  The Plaintiff has failed to show any reason why the Defendant would terminate him (or, in this case, would want to make him quit or retire) for filing the EEOC complaint.

Mr. Ford claims that the causal relationship is shown because "George's adverse treatment began almost as soon as he was put back under Reiser's supervision on the [Drive Off] job."  Even if this were true, and for the purposes of summary judgment the Court treats it as such, the Defendant received notice of the EEOC complaint around May 4, 1998.  Mr. Ford did not begin the Drive Off job until October 5, 1998.  This six-month lapse does not give rise to an inference of causation.  And even if six months were indeed a "short period" as urged by Mr. Ford, the close proximity of the protected activity and adverse action, although certainly a factor that must be weighed, can in no case, standing alone, be the basis for a finding of causation.  While the proximity in time between engaging in a protected activity and adverse employment action may give rise to an inference of causal connection, "temporal proximity alone will not support an inference in the fact of compelling evidence" to the contrary. *See Moon v. Transport Drivers, Inc.*, 836 F.2d 226, 229 (6th Cir. 1987).

that position ended, he was able to bump a fellow worker from another job due to his seniority under union rules. And when he had difficulty in that job, his supervisor arranged for other workers to help him, and even stepped in himself on one occasion to assist Mr. Ford. This is not adverse.

Mr. Ford portrays the adverse employment as being the "overload of work" he was given while in Drive Off. However, as Mr. Ford's deposition testimony reveals, he complained of work overloads in virtually every position he held during the times relevant to this lawsuit, both *before* and *after* the filing of the EEOC complaint:

- Mr. Ford's initial problems, as Inspector in Department 71, involved King and Milling "getting together making [him] work harder than they was working."

- Mr. Ford testified that his next primary job, Porter in Department 41, "was too much work."

- Mr. Ford testified that in his final primary job, Drive Off in Department 71, he "didn't have enough time to get it all done what was being done."

Thus, there is no evidence that there was any period here--either before or after the filing of the EEOC complaint--that Mr. Ford did not believe that he had too much work. And there is no evidence in the record that the workload he was given in Drive Off was in any way different from that of the previous person in that position (a white female).

Nor can his suggestion that he was being "watched" while in Drive Off be construed as an adverse employment action. He admitted that he would at times get behind in this position--even with additional help--and that the Corvettes coming off of the assembly line would occasionally bump into the ones he had left in

Plant in Bowling Green, Kentucky. From Spring 1997 until April 3, 1998, Ford worked in Department 71, known as Inspection, with Larry King ("King") and Don Million ("Million"), among others. Besides Ford, all of the other inspectors in Department 71 were Caucasian.

Inspectors were responsible for performing diagnostic and alignment tests on finished vehicles before they were shipped. One such test involved headlight alignments that could be done at either the "automatic pit," where inspectors only had to enter a code into a computer, or at the "manual pit," which required inspectors to attach instruments to the headlights and then manually set the alignment with a screwdriver. Ford claims that King and Million "were racists" who were "trying to move [him] off of his job" by making his work more difficult. Specifically, Ford contends that King and Million forced him into doing additional work by claiming the automatic pit for themselves, often leaving him to use the more difficult manual pit. Department 71 inspectors also worked with "rerun cars" that previously had problems discovered and repaired, and been returned once corrected. As these cars did not necessitate the full range of normal tests, rerun cars were preferred by the inspectors to those first coming off of the assembly line for full inspection. King and Million, Ford asserts, conspired to take more than their share of rerun cars, leaving him to do more work on vehicles originally coming off the assembly line.

Ford confronted King and Million about this treatment, but they denied conspiring to make him do more work. Ford claims that he once asked King and Million why they were making him work harder than they did, and testified in his deposition that "they said, in a joking way, 'you're black and we're white and we aren't supposed to work hard . . . .'" Plaintiff perceived that King and Million were upset that he, as an African-American, had more seniority than they did, and stated that "they told me that a black man shouldn't have that position." Ford contends that both King and Million called him "a nigger" more than once over the years. Plaintiff also

claims that King once called another African-American employee "a monkey."

Ford complained on numerous occasions to his supervisor, Butch Reiser ("Reiser"), and his union representative, Joe Thien ("Thien"), about general mistreatment from King and Million, although he cannot recall when such conversations occurred. Ford claims that he made Reiser aware, during some of these discussions, that he believed the problems were race-related. When Reiser asked Ford why they were acting as they were, Ford told him that "I had more seniority and they resented that because I was black and they — both of them were white." Plaintiff contends that Reiser told him on at least one occasion that Reiser did not believe the problems involved race. Reiser and Thien promised to talk with King and Million. Ford does not know whether they talked with them privately, but Reiser came to the work area and told King, Million, and Ford that they all needed to work together.

On April 3, 1998, Ford went to Reiser and again complained that his coworkers were deliberately "screwing [him]" and were "working [him] hard" by forcing him to use the manual rather than automatic pit. Reiser asked Ford what he wanted him to do about it, and Plaintiff responded, "talk to those guys and stop them from creating [a] harsh environment for me to work in." Reiser told Ford that he would talk to his coworkers. Plaintiff then phoned Dorian Lee ("Lee"), an African-American labor relations representative, and asked him to speak with Ford's coworkers about the mistreatment. Lee was in a meeting at the time but agreed to come to the work area as soon as the meeting was finished.

After calling Lee, Ford approached Million and "asked him why were they making [his] job harder," to which Million replied, "fuck you." At that point, a physical altercation broke out between Ford and Million. Plaintiff claims that he struck Million first because he believed that Million was reaching for a knife. Million was left bleeding on the floor as a result of the fight. Ford was then taken to an interview with Thien,

---

## CONCURRING IN PART, DISSENTING IN PART

---

MARTHA CRAIG DAUGHTREY, Circuit Judge, concurring in part and dissenting in part. I agree with the majority that the district court was correct in granting summary judgment to the defendant on the plaintiffs' state law tort claims. However, I cannot agree with its conclusion that George Ford's Title VII claim for retaliatory discharge should have survived summary judgment.

The district court made two crucial findings in dismissing the Title VII action: (1) that no adverse employment action had occurred, and (2) that even if an adverse employment action could be shown, the plaintiff had presented no evidence tending to show a causal connection between his filing of the EEOC complaint and the purported adverse employment action. If the district court was correct on either basis, the plaintiff's attempt to establish a prima facie case fails.

The record must, of course, be reviewed in the light that is most favorable to the non-movant, the plaintiff in this case. There is nothing to suggest that the district court did otherwise. Moreover, the evidence to support the district court's findings was ably set out in the memorandum opinion filed by the court on December 7, 2000, as follows:

First, nothing in the record tends to show that Mr. Ford suffered any adverse employment action, and in fact, his own testimony suggests quite the opposite. After being suspended and then terminated for assaulting a co-worker, Mr. Ford was reinstated as an employee. When he returned to work, he was given a position favored by many employees. He complained that his workload was too great, and his supervisors arranged to lighten his duties (adding additional duties--cleaning the stainless steel--only if Mr. Ford completed his other tasks). When

and conjugal relationship between husband and wife, or wife and husband.
(2) Either a wife or husband may recover damages against a third person for loss of consortium, resulting from a negligent or wrongful act of such third person.

KY. REV. STAT. § 411.145 (2002). In this case, Mrs. Ford's testimony demonstrates that, although she and her husband suffered from stress, the basic aspects of their married life did not change as a result of Defendant's conduct. Throughout 1997 and 1998, Mrs. Ford testified that they engaged in all of their normal marital activities, including attending church, eating out occasionally, fishing in the summer, and having regular sexual relations. In addition, she stated that her husband continued to assist with cooking, cleaning, and yard work. Thus, Plaintiff has provided no evidence to support her loss of consortium claim.

This Court, therefore, **AFFIRMS** the district court's grant of summary judgment to Defendant as to Plaintiff's loss of consortium claim.

## VI.  CONCLUSION

For the foregoing reasons, the Court **REVERSES** in part, **AFFIRMS** in part, and **REMANDS** the district court's grant of summary judgment to Defendant.

Lee, and Brian Collins ("Collins"), who was another supervisor acting in place of Reiser. After answering a series of questions, Ford was told that he was suspended until further notice. Before leaving the plant, Plaintiff filed a formal grievance alleging that his punishment for the fight was unjust and excessive. On April 11, 1998, Defendant terminated Plaintiff's employment because of the fight. On April 28, 1998, Lee sent Ford a letter stating that Ford's grievance had been settled and that he could return to work. Sometime in April 1998, Plaintiff filed a race discrimination charge with the Equal Employment Opportunity Commission (EEOC).[1] The GM plant received notice that Ford had filed a charge of discrimination with the EEOC through a letter to Lee, which was dated May 4, 1998.

On May 6, 1998, Plaintiff returned to work and met with Thien, Lee, Collins, Bill Schanuel, president of the local union, and an unidentified member of Defendant's personnel department. Ford was informed that he must stay away from King and Million, could not go into his former work area, and would be placed at disciplinary level five, one level below termination. The unidentified person allegedly told Ford that "if [he] sneezed [he] would be fired." After the meeting, Ford began a different inspection job in Department 71 and worked there for about one week. Plaintiff then voluntarily transferred into a "porter" position in Department 41, where he was responsible for cleaning several areas of the plant.[2] As a porter, Ford was required to mop, dust, vacuum, and clean, among other things, eight bathrooms. Ford soon complained to his Hispanic supervisor, Kelly Bricino ("Bricino"), that the job "was too much work." Ford claims that GM management instructed Bricino to "give [him] a hard time" and bases this contention on Bricino's comment that "they told me about you."

---

[1] Plaintiff cannot recall the date on which he filed his EEOC claim.

[2] The job of porter is apparently a coveted position, and employees with seniority often are used on a temporary basis to fill in for vacationing porters. Ford's porter position was on a temporary basis.

After hearing Ford's complaint, Bricino and another supervisor, Marty Fortier, purported to decrease his work by allowing Ford to clean only six, rather than eight, bathrooms. But Ford was instructed to also wipe down the stainless steel in the six bathrooms if he had time, which he did not have to do previously. Plaintiff felt that there was no net change in his workload and, if anything, his work became even more difficult as a result of these changes. Ford claims that he had more work than any of the other porters as a result of a directive from management as punishment for his EEOC claim.

On October 5, 1998, Ford returned to Department 71 under the supervision of Reiser because there was no need for his continuing temporary porter assistance. Plaintiff was then given a position in "drive-off," which involved inspecting the vehicles for visible imperfections, checking the fluid levels, making further visual inspections under the hood, and performing minor electrical testing. Once that work was completed, information about the vehicle would be entered into a computer, and cars with problems would be taken to the appropriate repair area, while those deemed fit would be taken to the shipping area. Ford had difficulty in this new position from the beginning. As he was being trained by Thelma Williams ("Williams"), he found that "there was a lot of stuff to remember" and he fell behind quickly. Ford felt that there was not enough time for him to perform all of the necessary tasks and enter the information into the computer. When he fell behind, cars would bump into each other as they came off of the line. Williams returned on several occasions to help him, and Reiser instructed Mike Ritter ("Ritter") to assist Ford when he "got into a hole." Ford claims that Ritter helped him for a while, but then stopped.

Plaintiff contends that Reiser told Thien that if the vehicles kept bumping into each other, Ford would be fired. Thien met with Reiser and Ford, and Plaintiff requested a reduction in his workload. Ford claims that Reiser refused this request and stated that Williams had been able to perform the same amount of work. Plaintiff then filed a grievance claiming that

Under Kentucky law, a plaintiff alleging intentional infliction of emotional distress must establish that: (1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was so outrageous and intolerable as to offend generally accepted standards of morality and decency; (3) there is a causal connection between the conduct and the emotional distress; and (4) the emotional distress has been severe. *Kroger Co. v. Willgruber*, 920 S.W.2d 61, 67 (Ky. 1996). In the matter *sub judice,* the district court was correct in ruling that Plaintiff could not satisfy this test. Ford may be able to establish that GM's conduct was intentional or reckless, but cannot claim credibly that an increased workload, heightened scrutiny, and constructive discharge was so outrageous and intolerable as to offend generally accepted standards of morality and decency. Ford also has not demonstrated that his emotional distress has been severe. He does not, for instance, claim that he needed counseling or other treatment as a result of Defendant's actions. Ford has offered no evidence to support his conclusory allegations that his emotional distress has been severe.

Thus, the Court **AFFIRMS** the district court's grant of summary judgment to Defendant on Plaintiff's intentional infliction of emotional distress claim.

## V.    PLAINTIFF'S LOSS OF MARITAL CONSORTIUM CLAIM

Plaintiff Mary Ford, George Ford's wife, asserts a claim for loss of marital consortium. She testified that her life was upset by the stress that her husband was forced to endure due to Defendant's retaliation. Mrs. Ford stated that "when he's stressed and when he's upset, you know, I'm — I'm upset, too, because I'm worried about him." Defendant argues that Mrs. Ford cannot recover, because she has suffered no loss of consortium in this case.

In Kentucky, loss of consortium is governed by statute:

1) As used in this section "consortium" means the right to the services, assistance, aid, society, companionship

after Reiser resumed his supervision of Ford in Department 71. Previously, Ford was under Bricino's supervision as a porter.[4] Reiser was aware that Ford had long complained of a racially hostile workplace and knew that Plaintiff had filed a complaint with the EEOC. A trier of fact could impute a retaliatory motive to Reiser, in as much as he supervised Ford at the time of the EEOC filing and did nothing to defuse the racial tension in Department 71 that led to Ford's suspension. Once under Reiser's supervision again, Ford claims that his workload increased, that he was subjected to heightened scrutiny, and that he was threatened with termination if his struggles at the drive-off continued. Such facts are enough to show a causal connection, for purposes of a *prima facie* case.

When viewed in the light most favorable to Plaintiff, the evidence and reasonable inferences drawn therefrom support Plaintiff's claim of retaliation. The Court, therefore, **REVERSES** and **REMANDS** the district court's grant of summary judgment to Defendant on Plaintiff's claim of retaliation under Title VII and the Kentucky Civil Rights Act.

## IV.   PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND OUTRAGEOUS CONDUCT CLAIM

Plaintiff argues that federal case law permits an action for intentional infliction of emotional distress when the underlying allegations involve retaliatory discharge. Ford asserts that Defendant's retaliatory conduct was intentional and gave rise to outrageous conduct liability. Defendant maintains that even if it retaliated against Ford, Plaintiff cannot argue that such retaliation rose to the level of outrageous conduct.

---

[4] Interestingly, Plaintiff contends that Bricino commented that "they told me about you" — an indication that GM management may have suggested that Ford's work as a porter be made more difficult than normal.

he needed either more help or less work in this position. Ford believed that he was being set-up to fail so that GM could fire him and jeopardize his pension.

On November 4, 1998, Ford took sick leave based on illness due to "pressure from management." Plaintiff claims that "management would take turns [] sending supervisors down, standing over [him], and trying to see if [he] would make a mistake or see[] if the cars ran together or [if] they could find some reason to terminate [him]." Ford contends that the stress of being monitored by management caused high blood pressure and numbness in his arm. Plaintiff maintains that he never had blood pressure or related problems before coming under the enhanced scrutiny of Reiser and management.

On December 14, 1998, Ford returned to the drive-off position, but the workload was the same, if not worse. Reiser assigned Mike Tappen to help Ford when he had trouble, but Plaintiff still fell behind in his assignment. On December 22, 1998, Ford decided to retire, rather than risk termination, and collect full pension and benefits based upon his more than thirty years of service to GM.

Plaintiff Ford and his wife filed suit against Defendant on March 29, 1999. Their Amended Complaint, filed on April 9, 1999, sought compensatory and punitive damages based upon allegations of intentional infliction of emotional distress and/or outrageous conduct; loss of consortium; wrongful discharge; and violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000 *et seq*. (1991), the Kentucky Civil Rights Act, K.R.S. § 344, and 42 U.S.C. § 1981. On December 7, 2000, the district court granted Defendant's motion for summary judgment on all counts. Plaintiffs filed this timely appeal on January 4, 2001, which raises the following issue for our consideration: whether the district court erred by failing to draw reasonable inferences in favor of Plaintiffs and granting summary judgment in favor of Defendant.

## II.  STANDARD OF REVIEW

This court reviews *de novo* a district court's decision to grant summary judgment. *Peck v. Bridgeport Machs., Inc.*, 237 F.3d 614, 617 (6th Cir. 2001).  Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1388-89 (6th Cir. 1993).  In response, the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.,* 8 F.3d 335, 339-40 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

In evaluating a motion for summary judgment the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  In responding to a motion for summary judgment, however, the non-moving party "may not rest upon its mere allegations . . . but . . . must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994).  Furthermore, the existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury

position.  Accordingly, it was not unreasonable for Plaintiff to fear being fired and losing his pension.  While Plaintiff has not offered any evidence to prove that Defendant intended the impact of its conduct on Ford, he has produced evidence that GM's management may have retaliated against him after his EEOC complaint was filed.  When Ford was brought back to work on May 6, 1998, following his suspension, he was placed at disciplinary level five, just one level short of termination.  The unidentified personnel employee with whom he met that day allegedly told Ford that "if [he] sneezed [he] would be fired."  Ford also claims that he was told that he would be fired if the vehicles kept bumping into each other at the drive-off.  Defendant, therefore, should have reasonably foreseen that its conduct would lead Plaintiff to preserve his pension by resigning rather than risking imminent termination.

Plaintiff's increased workload, heightened scrutiny, and constructive discharge was not *de minimis* employment action.  Rather, taken together, it constituted materially adverse employment action sufficient to satisfy the third prong of the *prima facie* test.

Plaintiff has also produced evidence of a causal connection between his EEOC complaint and this adverse employment action.  Ford claims that the causal connection is shown because his adverse treatment began almost as soon as he was placed under Reiser's supervision at the drive-off.  Defendant contends that the five months between Ford's EEOC filing and his return to Department 71 disproves a causal connection, and the district court agreed.  Although "temporal proximity alone will not support an inference in the face of compelling evidence" to the contrary, "the proximity in time between protected activity and adverse employment action may give rise to an inference of a causal connection." *Moon v. Transport Drivers, Inc.*, 836 F.2d 226, 229 (6th Cir. 1987) (citations omitted).

Plaintiff's measure of time is more appropriate in this situation, as the adverse action began almost immediately

complained of having too much work until after he filed his EEOC complaint. Moreover, the fact that Thelma Williams was able to do this job is immaterial, as she was a younger employee who may have learned the particular demands of the drive-off more easily.

Second, the record supports Plaintiff's contention that he was subject to a racially hostile workplace in which his actions in the drive-off area were scrutinized more closely than those of his coworkers, and that Defendant's management attempted to make his life as an employee unpleasant. While some level of supervision for a struggling employee is warranted, Ford claims that the scrutiny after his EEOC filing was more intense than his prior perception of supervision in that area. Defendant may well have been watching him more closely than normal to find a reason to terminate him in retaliation for his EEOC filing.

Finally, the record contains some evidence to support Plaintiff's claim that he was constructively discharged. A finding of constructive discharge "requires an inquiry into both the objective feelings of an employee, and the intent of the employer. A constructive discharge exists if working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Yates v. Avco Corp.*, 819 F.2d 630, 636-37 (6th Cir. 1987) (citations omitted). A plaintiff must show that the employer intended and could reasonably have foreseen the impact of its conduct on the employee. *Id.*

Defendant claims that Ford's difficulty in the drive-off area was simply Plaintiff's misfortune. But, as Plaintiff performed successfully in a variety of jobs at GM for more than thirty years, the evidence raises at least the possibility that Ford was, indeed, set up to fail in the drive-off area. Plaintiff contends that Reiser told Thien that if Ford's trouble persisted, and the vehicles kept bumping into each other at the drive-off, Ford would be fired. Ford's request for a reduction in his workload was rejected, forcing him to file a grievance claiming that he needed either more help or less work in this

could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

### III.  PLAINTIFF'S RETALIATION CLAIM

Plaintiff argues that the district court erred in its treatment of his retaliation claim for two reasons. First, he contends that the court failed to draw reasonable inferences in his favor by concluding that Ford suffered no adverse employment action. Ford argues that he was given additional work and was subject to increased managerial scrutiny after he filed his EEOC complaint and returned to work on May 6, 1998, which is tantamount to an adverse employment action. Although Ford testified that he had more than his share of work before filing the complaint, he also indicated that he was given too much work after resuming his job. Thus, he maintains that the level of work was not the same before and after his complaint was filed, but that it increased after he alleged racial discrimination. He claims that his retirement was, in fact, a constructive discharge and, hence, an adverse employment action. Second, Plaintiff asserts that the court failed to draw reasonable inferences in his favor by concluding that there was no causal connection between Ford's EEOC filing and his adverse treatment by Defendant. Ford claims that the evidence supports a causal connection between his complaint and the increased workload and supervision that he experienced while working for Reiser.

Defendant argues that Ford did not suffer an adverse employment action once he resumed employment in Department 71. First, Defendant maintains that the evidence does not support Ford's contention that he was given an increased workload under Reiser's supervision. Rather, GM asserts that Ford simply landed, through normal contractual processes, in a job that he could not handle. Second, Defendant claims that there was nothing unusual about the level of managerial scrutiny that Ford received while working in the drive-off area. GM points out that Ford admitted that he had problems in the position from the beginning, and

asserts that there is nothing adverse about supervisors watching an employee who has trouble performing his job. Defendant also denies that Ford was constructively discharged, as his working conditions were not intolerable, and Reiser attempted to help him do the job and prevent him from failing. Finally, Defendant argues that there was no causal link between any adverse employment action and Ford's EEOC complaint. GM claims that the more than five months between the EEOC filing and Ford's return to Department 71 is insufficient to demonstrate a causal connection.

To make a *prima facie* case of Title VII retaliation, a plaintiff must prove: (1) he engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000) (citing *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir.), *cert. denied*, 498 U.S. 984 (1990)).[3] Once the plaintiff has established a *prima facie* case, the burden of production of evidence shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions. *Id.* at 793. The plaintiff, who bears the burden of persuasion throughout the entire process, must then demonstrate that the defendant's proffered reason was false. *Id.*

In the matter *sub judice*, the parties agree that Ford engaged in protected activity by filing his EEOC complaint and that GM, through the May 4, 1998 letter, was aware of the protected activity. The principal disputes are whether Ford suffered an adverse employment action and whether there was

---

[3] Plaintiff's retaliation claim under the Kentucky Civil Rights Act ("KCRA") is subject to the same analysis. "The language of the KCRA generally tracks the language of Title VII and, thus, 'should be interpreted consonant with federal interpretation.'" *Morris*, 201 F.3d at 793 (quoting *Meyers v. Chapman Printing Co., Inc.*, 840 S.W.2d 814, 820 (Ky. 1992)).

a causal connection between the protected activity and the adverse employment action.

With respect to the third element of the *prima facie* case, the adverse employment action must be "materially adverse" for the plaintiff to succeed on a Title VII claim. *See Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999); *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 886 (6th Cir. 1996). The Sixth Circuit has noted the requirements for establishing a materially adverse employment action:

[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Hollins*, 188 F.3d at 662. This Court has consistently held that *de minimis* employment actions are not materially adverse and, thus, not actionable. *See, e.g., Bowman v. Shawnee State University*, 220 F.3d 456, 462 (6th Cir. 2000).

In this case, the evidence available indicates that Defendant may well have taken materially adverse employment actions against Plaintiff. First, the record suggests that Ford was forced to work harder in Department 71 *after* he filed his EEOC complaint than he was before he engaged in that protected activity. The fact that Plaintiff claimed that King and Million forced him to do more than his share of work before he complained of racial discrimination does not preclude the possibility that GM retaliated against him by increasing his already heavy workload after he filed his complaint. It is telling that, by all accounts, Plaintiff performed well in a variety of capacities at GM for nearly thirty years, but only failed in the one job that he was assigned after complaining of race discrimination. Ford never