NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0811n.06
Filed: October 4, 2005

No. 04-3790

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| EDWARD HERLIK, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | On Appeal from the United States |
| | ) | District Court for the Northern |
| CONTINENTAL AIRLINES, INC., | ) | District of Ohio |
| | ) | |
| Defendant-Appellee. | ) | |

Before: **BOGGS, Chief Judge; GIBBONS, Circuit Judge; and QUIST, District Judge.**[*]

**PER CURIAM**. Edward Herlik is a former pilot for Continental Airlines ("Continental"). Herlik objected to his discharge, and he brought this diversity suit against his former employer. Herlik first made a claim against Continental for a state law tort: wrongful discharge in violation of public policy. Herlik alleges that he was discharged because he made safety complaints to a senior pilot during a flight, and that such complaints are protected by public policy. He subsequently added a state law claim for spoliation of evidence. The district court granted summary judgment in favor of Continental on both claims, and Herlik now appeals. We affirm the judgment of the district court.

---

[*]The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

**I**

Herlik was hired as a pilot by Continental on October 7, 1998. After completing on-ground training, Herlik was assigned to flights beginning in November 1998. Herlik was a probationary employee, meaning that he was hired for a one-year trial period during which employment at Continental was "at-will." Had he been retained for more than one year, he would have become a regular employee subject to the protection of a collective bargaining agreement.

During their probationary period, pilots are required to fly with experienced line pilots, or captains, on various trips. Usually, such trips last three or four days, and a probationary pilot will fly approximately three trips each month. After each trip is finished, the captain fills out a probationary report regarding the performance of the probationary pilot. The probationary report evaluates four performance categories, Attitude, Professionalism, Proficiency, and Appearance, on a scale of one to five. Five represents an "excellent" evaluation, and one indicates a "poor" assessment. The captain sends the probationary report to the Chief Pilot's office.

During Herlik's tenure as a probationary pilot, the Chief Pilot at Continental in Cleveland was Daniel Burngasser. Burngasser is the ultimate decision-maker with respect to all termination decisions for pilots based out of Cleveland. During his probationary period, Herlik received both positive and negative probationary reports. Herlik received three negative reports and at least fourteen positive reports.[1]

---

[1]Positive reports are those reports where Herlik was scored a four or five in all of the performance categories and received no negative written comments. In the three negative reports, Herlik received at least one score below a four and the evaluating pilot also included written negative comments.

No. 04-3790
Herlik v. Continental Airlines

From July 13 to July 16, 1999, Herlik flew a three-day trip with Captain Daniel Perschau. Herlik asserts that during this trip, he observed Perschau failing to abide by a number of standard flight protocols. Herlik contends Perschau: (1) failed to brief the crew at the beginning of each flight; (2) failed to announce his intention or plan of action; (3) failed to designate the flying pilot; (4) frequently flew outside the limits of specified flight parameters; (5) failed to fly a stabilized approach; (6) rejected Herlik's attempted corrections; and (7) shut off communication with the flight crew. Herlik states that he raised these safety breaches with Perschau pursuant to his understanding of his responsibilities as the non-flying pilot under FAA regulations, Continental's flight operation rules, and protocols known as Crew Resource Management ("CRM"). Herlik testified that Perschau told him at the end of their last flight into Cleveland that Herlik was not a first officer, was not allowed to object to a captain's approaches above 500 feet, and was not allowed to correct his flying. Herlik testified that Perschau was irate with him. He also testified that Perschau told him that "probationary pilots have to watch their step because they have no union protection" and that when he [Perschau] gave a negative review about Herlik to Chief Pilot Burngasser, it would "start a process that would not work out well" for Herlik. Herlik testified that Perschau also stated that

As discussed below in connection with Herlik's spoliation claim, Herlik contends he should have had ten additional probationary reports in his record, for a total of twenty-seven reports in all. Herlik contends that Continental destroyed the additional reports. For purposes of summary judgment, the district court assumed that ten additional probationary reports regarding Herlik in fact existed and that they were positive evaluations.

For purposes of this appeal, we also assume that the additional reports would have been positive.

- 3 -

"when Captain Burngasser gets a wrong impression, or a negative impression, he is not going to change it."

Following the trip, Perschau filed a probationary pilot's report, stating that Herlik "has much to learn about flying the line and cockpit etiquette," is "[p]erhaps a bit too casual about his position as a new hire," and made "[t]oo many snide remarks to suit [him]." Herlik alleges Perschau made these remarks in retaliation for his complaining about Perschau's safety practices.

Due to Perschau's evaluation, Continental's "Professional Standards System" was initiated. Captain George Henning, Continental's Professional Standards Committee representative, was sent to talk to Perschau and Herlik. Herlik discussed his concerns regarding Perschau with Henning. Herlik was informed that Henning spoke with Burngasser about the situation and that both were satisfied that the issue was resolved. Herlik did not know specifically what Henning told Burngasser. Burngasser testified that Henning simply reported back to him that the issue had been resolved.

Herlik received two other negative probationary reports. The first was in June 1999 (before Herlik flew with Perschau), when Captain Lynch criticized Herlik for not keeping him informed of entries Herlik was making into the computer. Lynch also reported that the flight attendants had complained that Herlik had been "bothersome" and had used the cabin temperature control to get them to bring him food and beverages. Second, in August 1999 (after Herlik flew with Perschau), Burngasser received another negative probationary report regarding Herlik. In this report, Captain Tim Fogarty reported that Herlik twice told a flight attendant, "you look like shit." Fogarty further reported that he talked with Herlik about "accept[ing] food from flight attendants graciously since

they are busy and often don't get to the cockpit till descent." Fogarty noted that Herlik upset the flight attendants.

Burngasser held a disciplinary meeting with Herlik on September 21, 1999. A number of issues were raised with Herlik in this meeting. According to Herlik, Burngasser brought up the negative report from Perschau, but would not allow Herlik to present his side of the story. Burngasser stated that the issue had been resolved by Henning. Burngasser also brought up the negative reports by Captains Lynch and Fogarty. In addition, Burngasser brought up a number of, in Herlik's view, "minor" issues, including a December 1998 incident regarding the rescheduling of Herlik's vacation so that he could keep his license current. Captain Burngasser testified that he also brought up a report he received that Herlik wore blue jeans in the cockpit. Continental employees are allowed to fly free on Continental flights, and Continental pilots are allowed to sit in the cockpit, but pilots are not allowed to wear blue jeans while doing so. Herlik was asked about this incident, and Herlik stated that he did not own blue jeans. Burngasser testified that he questioned the credibility of Herlik's assertion.

At the conclusion of the meeting on September 21, Burngasser tried to schedule a follow-up meeting. Herlik told Burngasser that a proposed date was "inconvenient" for him. Burngasser testified that in his view Herlik, at this point, was in the "hot seat" and should have responded that this date was good for him. Herlik's response reinforced in Burngasser's mind a "lackadaisical" attitude, one of "not understanding what is important and what is not, protocol." Herlik, on the other hand, testified that he was merely being honest with Burngasser in stating that the date was not convenient for him.

On September 29, 1999, Herlik's employment with Continental was terminated.

Burngasser wrote Herlik a letter stating:

> A disciplinary hearing was held in this office on September 21, 1999. You, Vince Schiaretta and I were present.
>
> At issue were your Captain's Probationary Reports regarding your lack of CRM skills. We concluded the meeting with my stated intention to contact the Captains you had flown with. I then stated we would meet a week later to discuss my findings and subsequent decision regarding your employment status.
>
> After Vince Schiaretta and I agreed to meet Tuesday, September 28, 1999 at 2:00 p.m., you said that date was "not convenient" for you. When asked if you were flying on the 28th you said "No, but I will only have been home for 1 day." Your statement simply served to augment the previous Captain's reports, as well as your apparent lack of CRM, understanding of protocol and proper attitude. Based on Captain's reports and our meetings on the 21st and 28th of September I have determined that you do not possess the interpersonal skills necessary for proper crew resource management. Therefore your employment as a pilot with Continental Airlines is hereby terminated effective September 29, 1999.

Herlik appealed his termination internally. However, on November 1, 1999, Richard Kardell, Continental's Director of Flight Operations, wrote Herlik stating that the termination was upheld.

Herlik filed this diversity suit in federal court on November 13, 2002, under Ohio state law, claiming that Continental had wrongfully discharged him in violation of public policy. Herlik alleged that he was fired because he raised safety issues on a probationary flight. He subsequently added a state law claim for spoliation of evidence.

The district court granted the defendant's summary judgment motion on both claims on May 10, 2004. It found that Herlik could not establish that he was fired for conduct related to a public policy and that he could not show that the allegedly destroyed evidence would have been useful to him in litigation. Herlik now appeals on both claims.

**II**

We review a grant of summary judgment *de novo*, taking all facts in the light most favorable

to the nonmoving party. *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 543-44 (6th Cir. 2003).

In 1990, the Ohio Supreme Court created an exception to the general rule that either party

may terminate at-will employment for any reason: a tort for wrongful discharge in violation of

public policy. *Greeley v. Miami Valley Maintenance Contrs., Inc*., 551 N.E.2d 981, 981-82 (1990).

The Ohio Supreme Court has stated the following four elements for this tort:

> 1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).
> 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).
> 3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).
> 4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

*Collins v. Rizkana*, 652 N.E.2d 653, 657-58 (Ohio 1995) (internal quotation marks and citations

omitted).

Like the district court, we conclude that Herlik cannot establish causation. We also find that

Herlik cannot establish the clarity element – that there is a clearly established public policy

protecting his actions.

**A**

Herlik's claim fails because he cannot show that his safety complaints led to his termination.

There is no evidence that Burngasser, the supervisor responsible for the decision to discharge Herlik,

knew of those complaints when he terminated Herlik. Burngasser testified that he had no knowledge of the safety complaints, and there is no evidence to the contrary. Herlik also acknowledges that he never informed Burngasser of his safety concerns.

Herlik has two arguments for showing causation. The first is temporal proximity; specifically, that the discharge came two months after he made safety complaints to Perschau. However, temporal proximity alone is generally insufficient to establish causality. *Moon v. Transport Drivers, Inc*., 836 F.2d 226, 229 (6th Cir. 1987); *Pflanz v. Cincinnati*, 778 N.E.2d 1073, 1090 (Ohio Ct. App. 2002) ("[T]he mere fact that an adverse employment action occurs subsequent to the protected activity does not alone support an inference of retaliation.").

Herlik relies upon *Ford v. General Motors Corp*., 305 F.3d 545 (6th Cir. 2002). In *Ford*, the plaintiff was transferred to a more strenuous job some five months after filing an EEOC complaint. We noted that temporal proximity "between protected activity and adverse employment action may give rise to an inference of a causal connection." *Id*. at 554-55 (internal quotation marks and citation omitted). There are two substantial distinctions between this case and *Ford*. First, in *Ford* there was no intervening event between the EEOC complaint and the transfer to a less desirable position. In the absence of any other explanation, the *Ford* court thought it a plausible inference that the protected activity led to the adverse employment action. Here there were a number of other events between the alleged safety complaints and Herlik's discharge, including an additional negative probationary report, the meeting with Burngasser, and Herlik's statement to Burngasser that the proposed second meeting time was "inconvenient." These intervening events "break" the inference of causality because they can plausibly account for the discharge, whereas in

*Ford* there was no sensible explanation for the adverse action other than retaliation. Second, in *Ford*, the decision-making supervisor knew of the EEOC complaint. *See id.* at 555 ("[the supervisor] was aware that Ford had long complained of a racially hostile workplace and knew that [he] had filed a complaint with the EEOC. A trier of fact could impute a retaliatory motive to [the supervisor] . . . ."). In contrast, here there is no evidence that Burngasser knew of the alleged safety complaint. Temporal proximity alone is insufficient to support an inference of retaliatory motive when the supervisor did not know that Herlik engaged in the protected activity.

Finally, Herlik argues that even if Burngasser did not know of the safety complaints, his firing was indirectly caused by his safety complaints. He claims that Perschau's negative report was based on his safety complaints, and because that negative report was the basis of his firing, there is a causal connection between his safety complaints and his firing. However, whatever Perschau's motive in writing his negative report, there is no suggestion by Herlik that Perschau was dishonest or that the report included any fabricated information. Although Herlik claims Perschau was motivated to write the negative report because of his safety complaints, he does not claim that Perschau's report contained lies. What Burngasser received and evaluated was an accurate description of Herlik's performance on the probationary flight. Burngasser's decision, to the extent that it was based on Perschau's report, was therefore based on permissible considerations and not on any invidious motive.

**B**

We also conclude that Herlik has failed to establish that his alleged safety complaints jeopardized a clearly expressed public policy. The activity in question – which Herlik argues is

protected by public policy – is a subordinate pilot expressing disagreement with his or her chief pilot about safety procedures during a flight. It is worth noting that Herlik made no effort to pursue his alleged safety concerns with Continental as a whole or the government. He was not a whistle-blower, and he did not take any safety-related actions other than disagreeing with Perschau during the flight.

The Ohio Supreme Court has charted a somewhat jagged course in considering what constitutes a clear public policy for purposes of this tort. The court first recognized the wrongful discharge tort in *Greeley*, 551 N.E.2d at 986, when it found a sufficiently clear public policy where the General Assembly has adopted a statute specifically forbidding discharge for a particular reason. The court also noted that similarly actionable discharges might occur when the public policy implicated is "of equally serious import as the violation of a statute." *Id.* at 987. But in *Tulloh v. Goodyear Atomic Corp.*, 584 N.E.2d 729, 733 (Ohio 1992), the court reversed course and declared that "[a]bsent statutory authority, there is no common-law basis in tort for a wrongful discharge claim." Two years later the court overruled *Tulloh*, declaring that the existence of a clear public policy "may be discerned by the Ohio judiciary based on sources such as the Constitutions of Ohio and the United States, legislation, administrative rules and regulations, and the common law." *Painter v. Graley*, 639 N.E.2d 51, 56 (Ohio 1994). The court declined to be more specific, instead simply stating that "[f]ull development of the elements of the tort . . . will result through litigation and resolution of future cases." *Id.* at 57.

The boundaries of this tort are not entirely clear, but existing Ohio law indicates that Herlik's actions are not protected by a clearly expressed public policy. In practice, the Ohio Supreme Court

has usually found a clear public policy protecting an employee's activity only when there is a statute that prohibits firing employees for engaging in a particular protected activity. In other words, once a statute provides a right, the court then fashions a cause of action to enforce that right. Although the court has stated a willingness to find a clear public policy from sources other than legislation, it has not actually done so. *See, e.g.*, *Painter*, 639 N.E.2d at 57 (rejecting a claim that there is a clear public policy against discharging a public employee for becoming a candidate for a partisan elected office). In *Kulch v. Structural Fibers, Inc*., 677 N.E.2d 308 (Ohio 1997), for example, the court found a clear public policy against discharging an employee who filed an OSHA workplace safety complaint because a federal statute expressly prohibits discharging or discriminating against employees who file such complaints. *Id.* at 321-22 (plurality opinion) (citing 29 U.S.C. § 660(c)(1) ("No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under [OSHA].")). *Kulch* is typical; the wrongful discharge tort provides the remedy where the statute is silent. Here, in contrast, Herlik has not identified any statutory (or regulatory) protection for his alleged safety complaints.

There has been only one case where the court has found protected activity that was not explicitly protected by statute, but this is also distinguishable. *Collins*, 652 N.E.2d at 654-55 (holding that statutes prohibiting sexual harassment expressed a clear public policy that employees are not to be discharged for resisting or reporting sexual harassment). In *Collins*, unlike the cases cited above, the statute did not expressly prohibit firing employees who opposed sexual harassment. Nonetheless, the court found that:

> In order to more fully effectuate the state's declared public policy against sexual harassment, the employer must be denied his generally unlimited right to discharge an employee at will, where the reason for the dismissal (or retaliation resulting in constructive discharge) is the employee's refusal to be sexually harassed. Although there may have been no actual crime committed, there is nevertheless a violation of public policy to compel an employee to forgo his or her legal protections or to do an act ordinarily proscribed by law.

*Id.* at 658. In *Collins*, the plaintiff was attempting to assert a right granted by statute – freedom from sexual harassment; in contrast, Herlik was not exercising a statutory right when he complained to Perschau. There is no evidence that the regulatory scheme governing airline safety is clearly furthered by an unstated policy protecting pilots who disagree with one another during flight – indeed, while safety-based objections from one pilot to another could be beneficial, they could also amount to harmful distractions. The key point here is that there is no evidence of a public policy protecting objecting pilots. We therefore conclude that Herlik's actions were not protected by a clearly expressed public policy.

### III

Herlik also appeals the district court's dismissal of his claim for spoliation of evidence. He contends that Continental should have produced twenty-seven probationary reports from pilots with whom he flew, but only seventeen were produced. Herlik contends, without any supporting evidence or allegations, that the "missing" ten reports were destroyed by Continental and that these reports would have supported his claim for wrongful discharge. Under Ohio law, the elements of spoliation of evidence are:

> (1) pending or probable litigation involving the plaintiff,
> (2) knowledge on the part of defendant that litigation exists or is probable,
> (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case,
> (4) disruption of the plaintiff's case, and

(5) damages proximately caused by the defendant's acts[.]

*Smith v. Howard Johnson Co., Inc.*, 615 N.E.2d 1037, 1038 (Ohio 1993).

Herlik's spoliation claim is without merit because Herlik plainly cannot establish the fourth and fifth elements of the tort. Additional positive reports, on top of the fourteen produced, would not have helped Herlik's case.[2] The decision to discharge him was based on the three negative reports and the other incidents, including Burngasser's personal interactions with Herlik. There was no weighing or scoring process by which a bigger stack of positive reports would have overruled the concerns Burngasser had about Herlik. Thus, the presence of additional positive reports would not have enabled Herlik to show that he was wrongfully discharged.

**IV**

For the foregoing reasons, we **AFFIRM** the summary judgment granted by the district court in favor of the defendant.

---

**[2]**Indeed, the district court assumed that the additional ten probationary reports were positive when granting summary judgment.