NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0045n.06

No. 16-3091

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jan 20, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| FARLEY M. LEE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| CLEVELAND CLINIC FOUNDATION, et al., | ) | COURT FOR THE NORTHERN |
| | ) | DISTRICT OF OHIO |
| Defendants-Appellees. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**BEFORE:  KEITH, McKEAGUE, and WHITE, Circuit Judges.**

**DAMON J. KEITH, Circuit Judge.**  Farley Lee ("Plaintiff") appeals from the district court's order for summary judgment in favor of Cleveland Clinic Foundation, et al. ("CCF" or "Defendants").  The district court concluded that Plaintiff's claims of race, national origin, and age discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act ("ADEA") lacked any genuine dispute as to material fact and that Defendants were entitled to summary judgment as a matter of law.  Plaintiff also appeals the district court's rulings on a motion to strike and a motion to compel discovery.  We **AFFIRM** the district court's motion rulings and **REVERSE** the district court's summary judgment decision.

## I.  BACKGROUND

Plaintiff is of Chinese descent and was 61 years old at the time of the events at issue. (Lee Br. at 4, 6)  Plaintiff was born in India and immigrated to the United States in 1976 when she was 23 years old.  (*Id.*)  Plaintiff worked at CCF for thirty-eight years as a registered nurse ("RN").  (*Id.*)  Plaintiff received many awards for her service, including Nurse of the Year.  (*Id.*)

In 2009, Plaintiff began reporting to supervisor Josalyn Meyer ("Meyer"). (*Id.* at 7) Meyer generally gave Plaintiff positive reviews for her work performance. (*Id.*)

However, while employed with CCF, Plaintiff began feeling as though she was being discriminated against because of her age.  Plaintiff alleged that during performance reviews in 2013 and 2014, Meyer commented on Plaintiff's long tenure, told her "things have changed" and asked her when she was going to retire.  (Lee Dep. I. R. #33-5, 305:23-25; 306-1-25; 307:1-3) On a third occasion, Meyer passed by Plaintiff while she was walking in the skyway of the clinic and inquired as to where Plaintiff was going.  Plaintiff informed her that she was going to the gym to "de-stress."  (*Id.* at 306: 12-21; 346: 19-25)  Meyer then replied, "My father was a laborer when he was 15 years old and he doesn't know when to stop."  (*Id.*)

In addition to age discrimination, Plaintiff began to feel she was being discriminated against on the basis of race and national origin.  Plaintiff alleges that younger nurses called her an "oldbie" or "old bitch" and referred to rice she ate as "lice."  (Lee Dep. R. #33-4 at 170)  She asserts that one nurse stated, "you Chinese people eat anything that crawls and walks" and also stated that Plaintiff does not have "chinky eyes" even though she is Chinese.  (*Id.*)  In December 2013, Plaintiff reported the incident to a different supervisor, Debbie Brosovich ("Brosovich"), who responded that she was "overreacting" and being "sensitive."  (Lee Dep. R. #33-5 at 342:14-19)

2

On April 15, 2014, Meyer called Plaintiff into her office to discuss an incident in which Meyer asserted that Plaintiff had been "pushy or abrasive" with a patient. (Lee Aff. R. #29-11 ¶ 11) At that meeting, Plaintiff complained that she was being discriminated against because of her age and race. (*Id.*) On April 17, 2014, Plaintiff complained to Brosovich that Meyer discriminated against her because of her age and race. (*Id.* ¶ 12; Lee Dep. R. #33-4 at 165:8-19; Brosovich Dep. R. # 33-1 at 41:11-25) Brosovich informed Meyer of the complaint before calling Human Resources ("HR") to inform them of the same. (Brosovich Dep. R. #33-1 at 162-63)

On April 30, 2014, Meyer issued Plaintiff her first corrective action and performance improvement plan ("PIP") for "lack of nursing care and communication" and failure to take "personal accountability" for those actions. (Meyer Dep. R. #33-6 at 236-237; 159:20-22) Meyer testified that a patient's family orally complained that Plaintiff failed to administer medication to the patient, informed the patient that the mistake was a nursing student's, and urged the patient's family not to report the error. (Meyer Dep. R. #23-6 at 157-61) However, there is no record of any patient filing a written complaint against Plaintiff. (Meyer Dep. R. #33-6 at 256:19-25; 257:1-23)

After the issuance of the PIP, Plaintiff filed another complaint in writing with CCF's Senior HR Director, Jill Prendergast ("Prendergast"), challenging the PIP and claiming a hostile work environment. (Prendergast Dep. R. #33-9 at 116-117; Lee Ex. 82 R. #29-17 at 2; Lee Ex. 83 R. #29-17 at PageID #847) Her request for relief under the CCF Right of Review Policy was denied. (Prendergast Dep. R. #33-9 at 89)

On May 12, 2014, Plaintiff met with Lisa Ullman ("Ullman") from HR and complained that she was being treated differently because of her age and race. (Ullman Dep. R. #33-10 at

3

58:19-25; 59:1-4; 76:11-21; 81:11-23)    Plaintiff told her that Meyer had asked about her retirement and made comments about her own father's retirement.  (*Id*. at 77:17-25; 78-1-2)  Plaintiff told Ullman that she feared her managers were trying to discharge her.  (*Id*. at 100:3-25; 101:1)  However, HR did not investigate her complaints because it was determined that "there was nothing to investigate."  (*Id*. at 105:15-19)

Plaintiff testified that she was given a heavier workload than other nurses.  (Lee Dep. R. #33-5 at 307)  When she asked for a lighter load, she was admonished.  (*Id*.)  Plaintiff testified that assistant nurse managers constantly followed her around the unit and questioned her patients about her work performance, which she claims they did not do to younger, Caucasian nurses. (Lee Dep. R. #33-5 at 309:2-9)

On July 16, 2014, Meyer prepared another corrective action against Plaintiff, which was a written warning, regarding failure to provide safe care for a patient with a serious medical condition.  (Lee Ex. 109 R. #29-17 at 4-5)  The corrective action alleged that Plaintiff failed to monitor and escalate elevated vital signs to the medical team.  (*Id*.)  When Plaintiff received the corrective action on Friday, July 18, 2014, she again complained of discrimination and told Meyer that she planned to get a lawyer.  (Meyer Dep. R. #33-6 at 243:23-25; 244:1-7)  A few hours later, she was suspended for at least three workdays pending investigation for allegedly confronting the patient after receiving the corrective action, telling the patient that she was being fired, and upsetting the patient, who then complained about the incident to the nursing staff. (Brosovich Dep. R. #33-1 at 168:1-16; Defendants' Ex. 27 R. # 33-21 at PageID # 3758)  Shortly after midnight on July 21, 2014, Plaintiff sent an email to Defendants stating:  "Effective immediately on this day of Sunday, July 20, 2014 I am submitting my resignation . . . ."  (Ex. R. # 32-7 at PageID # 1052)  After Plaintiff resigned, Meyer hired several RNs, all below the age of

thirty, starting with Matt Holdyk ("Holdyk"), a twenty-nine year old Caucasian male. (Meyer Dep. R. 33-6 at 291-92)

Plaintiff filed a discrimination complaint in federal district court. (Complaint R. #1) During the pendency of the case, Plaintiff received employment files for each nurse in her unit; she filed a Notice of Discovery Dispute with the court challenging CCF's failure to provide employment files for an additional 80 nurses who worked on units different from Plaintiff but who were still under Meyer's supervision. (Notice R. #14) As an apparent compromise, the district court granted only a random sampling of ten percent of the 80 files. (Order R. #18 at PageID 227) The district court found that compelling the production of all 80 of the files would be unduly burdensome for Defendants. (*Id.*)

CCF later filed a Motion for Summary Judgment on the basis that Plaintiff's claim lacked any genuine dispute as to material fact and that Defendants were entitled to judgment as a matter of law. (MSJ R. #23) The Motion included a declaration from Meyer and business records she authenticated. Plaintiff moved for an extension of time to file a response to the Motion. (Motion R. #24) The district court granted the extension and ordered that "there will be no further extensions given the Final Pretrial and Trial dates." (Order issued 11/10/2015) Plaintiff then sought to extend the page limit by an additional ten pages. (Motion R. #25) The district court granted an extension of five pages. (Order issued 11/13/2015) Plaintiff then filed her brief in opposition of the Motion for Summary Judgment. (Opp'n. R. #29)

Later, Plaintiff filed a Motion to Strike Meyer's declaration, which was made after Meyer's deposition testimony. (Motion R. #30) Plaintiff argued that the declaration was inconsistent with prior record evidence and contained or incorporated documents that were inadmissible hearsay, unfairly prejudicial, and not properly authenticated. (*Id.*) The district

court denied the motion, finding that Plaintiff was aware of these arguments at an earlier time, but only made them after filing her opposition to the summary judgment motion to avoid the page limit by asserting the argument in a separate motion. (Order R. #31)

The district court later granted CCF's Motion for Summary Judgment. (Order R. #34) Plaintiff timely appealed. (Notice R. #36)

## II. DISCUSSION

### A. Standard of Review

"We review a district court order granting summary judgment de novo." *Coble v. City of White House, Tenn.*, 634 F.3d 865, 867 (6th Cir. 2011) (citation omitted). "Summary judgment is proper if the evidence, taken in the light most favorable to the nonmoving party, shows that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* at 867-68 (quoting *Schreiber v. Moe*, 596 F.3d 323, 329 (6th Cir. 2010)).

Because the district court granted summary judgment in favor of Defendants, it is important to impress upon our standard of review in this case.

> Summary judgment should be granted *only* where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is and no genuine issue of fact remains for trial. The purpose of the rule is not to cut litigants off from the right to trial by jury if they really have issues to try.

*Rogers v. Peabody Coal Co.*, 342 F.2d 749, 751 (6th Cir. 1965) (citing *Sartor v. Arkansas Nat. Gas Corp.*, 321 U.S. 620, 627 (1994)) (emphasis added).

### B. Analysis

**1. Age, Race, and National Origin Discrimination Claims**

Plaintiff alleges that CCF discriminated against her based on her age, race, and national origin. "Title VII provides that it shall be unlawful for an employer to 'discharge any individual, or otherwise to discriminate against any individual with respect to . . . compensation, terms,

conditions, or privileges of employment, because of such individual's race[]'" or national origin. *Weeks v. Michigan Dept. of Comty. Health*, 587 F. App'x 850, 855 (6th Cir. 2014) (quoting 42 U.S.C. § 2000e-2(a)(1)). Further, "[t]he ADEA prohibits employers from discriminating 'against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's age.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998) (quoting 29 U.S.C. § 623 (a)). "A plaintiff may establish a claim of discrimination either by introducing direct evidence of discrimination or by proving inferential and circumstantial evidence that would support an inference of discrimination." *Weeks*, 587 F. App'x at 855 (citation omitted).

Plaintiff alleges that she can prove direct evidence of discrimination. "Direct evidence is evidence that requires the conclusion, without any inference, that unlawful discrimination was at least a motivating factor in an employer's actions." *Douglas v. Eaton Corp.*, 577 F. App'x 520, 523 n.1 (6th Cir. 2014) (citing *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003)). "Any discriminatory statements must come from decisionmakers to constitute evidence of discrimination." *Flones v. Beaumont Health System*, 567 F. App'x 399, 404 (6th Cir. 2014) (citations omitted). "Statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, do not satisfy the plaintiff's burden to demonstrate animus." *Id.*

In her opposition to summary judgment, Plaintiff argued that Meyer's questions to Plaintiff concerning when she would retire constituted direct evidence of age discrimination. (Lee Op. R #29 at 23) Plaintiff also argued that her coworkers' comments that she was an "oldbie" and their derogatory comments about her Chinese heritage constituted direct evidence of discrimination because her supervisor refused to investigate the allegations after she made the

complaint. (*Id.*) However, the proffered racial comments are not direct evidence of discrimination because a decisionmaker did not make them. They were made by Plaintiff's coworkers. *See Flones*, 567 F. App'x at 404. Additionally, Meyer's comments regarding Plaintiff's retirement decisions are not direct evidence of age discrimination because they require an inference that Meyer's comments concerning retirement were a proxy for age discrimination. That is, her comments require us to infer that she asked Plaintiff about her retirement because she wanted to pressure Plaintiff to retire and was motivated to do so on account of Plaintiff's age. Further, Meyer's comments regarding retirement were unrelated to the decisionmaking process and accordingly do not provide direct evidence of unlawful discrimination. *See id.*

Because Plaintiff lacks direct evidence of discrimination, we look for circumstantial evidence, which requires employing the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Weeks*, 587 F. App'x at 855.

> Under *McDonnell Douglas*, Plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. If Plaintiff succeeds in making out the elements of a *prima facie* case, the burden of production shifts to Defendant[s] to articulate some legitimate, nondiscriminatory reason for its actions. If Defendant[s] satisf[y] [their] burden of production, the burden shifts back to Plaintiff to demonstrate that the proffered reason was not the true reason for the adverse action.

*Id.* (internal citation and quotation marks omitted).

### a. Prima Facie Case

To establish a prima facie case of discrimination, Plaintiff must prove that she was: (1) a member of a protected class; (2) subjected to an adverse employment action; (3) otherwise qualified for the position held; and (4) replaced by someone outside of the protected class or that similarly situated employees outside of the protected class were treated more favorably. *Clayton v. Meijer, Inc.*, 281 F.3d 607, 610 (6th Cir. 2002) (citation omitted). It is undisputed by the

parties that Plaintiff is a member of a protected class and qualified for the RN position. CCF asserts that Plaintiff did not suffer an adverse employment action because they did not discharge her and thus she cannot prove that similarly situated employees were treated more favorably.

### i. Adverse Employment Action

Plaintiff argues that CCF subjected her to various adverse employment actions, including unwarranted discipline, increased surveillance, termination, or in the alternative, an indefinite suspension without pay. (Lee Br. at 26) Plaintiff additionally argues constructive discharge. (*Id.* at 31)

An adverse employment action is "a materially adverse change in the terms of . . . employment." *Kocsis v. Multi-Care Management Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). "Termination, decrease in wage or salary, change in title, diminished material responsibilities, or a material loss of benefits are all examples of a materially adverse change." *Mensah v. Michigan Dept. of Corrections*, 621 F. App'x 332, 334 (6th Cir. 2015).

### 1. Increased Surveillance and Discipline

Increased surveillance and discipline, whether warranted or not, do not constitute a material adverse change in the terms of employment in the discrimination context because those actions do not "constitute[] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008).

### 2. Termination

Plaintiff argues that the district court erred in finding that CCF did not terminate her. Plaintiff asserts that CCF terminated her by telling her never to return to her place of work and

informing her that they would mail her belongings. (Lee Dep. R. 33-4 PageID #1582) CCF responds by claiming that there is no evidence that it intended to terminate Plaintiff. However, when viewing the evidence in a light most favorable to Plaintiff, a jury could conclude that these actions established that CCF intended to terminate her. Thus, whether CCF terminated Plaintiff is a fact question for a jury to decide and the district court erred in making that finding at the summary judgment stage.

Even if a factfinder could conclude that CCF did not terminate Plaintiff, there is a genuine issue of whether CCF constructively discharged her. "To demonstrate a constructive discharge, the plaintiff must show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person; (2) the employer did so with the intention of forcing the employee to quit; and (3) the employee actually quit." *Hurtt v. International Services, Inc.*, 627 F. App'x 414, 420 (6th Cir. 2015) (citation omitted). It is undisputed that Plaintiff resigned, satisfying the third prong; consequently, we analyze the first two prongs of constructive discharge.

When analyzing the prong of intolerable working conditions, this court has held that "whether a reasonable person would have felt compelled to resign depends on the facts of each case, but we consider several factors, including but not limited to, reduction in salary and badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation." *Id.* Drawing all inferences in favor of Plaintiff, the record reflects that CCF employees subjected Plaintiff to humiliation through derogatory racial slurs, and pertinently, that these slurs generally went uninvestigated by CCF despite Plaintiff's complaints. Further, the record demonstrates that Meyer questioned Plaintiff about her retirement on various occasions, which a jury could conclude was harassment. The district court found that none of these events

would amount to evidence of an intolerable working environment. However, in *Logan v. Denny's Inc.*, 259 F.3d 558 (6th Cir. 2001), a case with similar facts, we determined that a genuine issue of material fact remained as to whether the plaintiff was subject to intolerable working conditions. In *Logan*, management and co-workers made comments to an employee such as "We don't serve 'grits' here," "You're probably used to that 'first of the month rush,'" and "These must have been some of your people," when referring to people who did not want to pay for their food. *Id.* at 572.[1] This court reasoned that the comments carried "an inference of invidious discrimination" in that they were made because of the employee's race, "sufficient enough to create a question of fact as to whether the comment[s were] harassing and created an intolerable atmosphere." *Id.* While this court in *Logan* acknowledged other adverse employment actions that were enough to satisfy the constructive discharge inquiry, including demotion and salary and responsibility reduction, it went on to analyze the racially motivated comments in isolation and concluded that they were enough to create a fact question of whether the plaintiff was subject to an intolerable work environment. *Id.* Similarly, in this case, the comments made to Plaintiff by her coworker, on their own, carried an inference of invidious discrimination as they were even more explicit than those made in *Logan*. They were overt comments that clearly concern Plaintiff's race and national origin. While management did not make those comments, viewing the evidence in a light most favorable to Plaintiff requires the finding that management failed to investigate the comments when Plaintiff informed them of such, thus unreasonably failing to respond to the coworker harassment. *Cf. Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 341 (6th Cir. 2008) (concluding that summary judgment was improper when the evidence showed that employer failed to investigate harassment

---

[1] The court found that in the context of the local community, these comments were references to low-income people and racial minorities. *Id.*

complaints). Further, the record shows that Meyer questioned Plaintiff regarding her retirement on several occasions. Unlike our case of *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 770-71 (6th Cir. 2008), where the plaintiff was subjected to similarly discriminatory comments but her employer promptly investigated and addressed the comments, CCF generally failed to investigate Plaintiff's complaints. Accordingly, a genuine issue of material fact remains as to whether these comments constituted harassment and humiliation strong enough to compel resignation and whether any failure to investigate contributed to a constructive discharge.

With regard to the second prong of constructive discharge, the employer's intention to force the employee to quit, a reasonable juror could find that Meyer intended to question Plaintiff repeatedly about her retirement plans because she was an older employee who may be more likely to retire and that she did so with the intention that Plaintiff quit her job. A reasonable juror could further find that CCF intended not to investigate Plaintiff's claims of age, race, and national origin discrimination because it wanted Plaintiff to leave her job. Those findings will hinge upon credibility determinations. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether [s]he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Thus, factual questions remain for a reasonable jury to answer with regard to constructive discharge and Plaintiff has established this element of her prima facie case.

### 3. Indefinite Suspension Without Pay

In *White v. Burlington Northern*, this court held that suspension without pay constitutes an adverse employment action. *White v. Burlington Northern & Santa Fe R. Co.*, 364 F.3d 789, 803 (6th Cir. 2004). The record reflects that Meyer suspended Plaintiff on Friday, July 18, 2014,

for at least three days. (Defendants Exhibit 27 R. # 33-21 at PageID # 3758) Meyer instructed Plaintiff not to return to work or call into the unit until she was instructed to do so. (*Id.*) While Meyer testified at her deposition that she suspended Plaintiff with pay, (Meyer Dep. R. # 33-6 at 263-64), Brosovich testified that Plaintiff's suspension was without pay. (Brosovich Dep. R. # 33-1 at 188) Plaintiff stated that she has not received payment for the days that she was suspended. (Lee Aff. R. #29-11 at PageID # 720) The district court found that whether Plaintiff was suspended with or without pay was not dispositive because Plaintiff submitted her resignation on Monday, July 21, 2014, at 12:08 a.m., before her suspension could take effect. (Ex. R. # 32-7 at PageID # 1052) The district court reasoned that the suspension was not an adverse employment action because Plaintiff resigned before she could suffer any financial loss as a result of the suspension. (Order, R. #34 at 16)

While we have not directly dealt with the issue of whether a suspension without pay must be served, or simply issued, to constitute an adverse employment action, our sister circuits have persuasively held that service of a suspension is a requirement if it is to rise to the level of an adverse employment action. The Seventh Circuit has held that "a suspension without pay that is never served does not constitute an adverse employment action." *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1120 (7th Cir. 2009) (internal quotations and citations omitted). This interpretation is in keeping with the Supreme Court's observation that discrimination must involve a "tangible" employment action that "in most cases inflicts direct economic harm." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 762 (1998). Failure to allow that harm to manifest prevents the tangible employment action from taking place. We have cautioned employees "not to assume the worst, and not to jump to conclusions too fast." *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002) (quoting *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d

1536, 1539 (11th Cir. 1987)). Thus, consistent with the Supreme Court, the holdings of our sister circuits, and this court's own pronouncements, Plaintiff's suspension without pay was not an adverse employment action because she resigned before she could serve the suspension.

### ii. Replacement and Treatment of Similarly Situated Employees

To prove the last prong of the prima facie case, Plaintiff asserts that Meyer hired a 29-year-old Caucasian male, Holdyk, to replace her. The district court found that "it was not clear from the testimony that the male was actually hired to replace [Plaintiff's] position or merely was selected for a job [Plaintiff] had previously performed." (Order, R. #34 at 18) Meyer testified that Holdyk was among a group of individuals who applied for nurse positions that were open before Plaintiff's resignation, but Holdyk was the first hired following Plaintiff's resignation. Whether CCF hired Holdyk to replace Plaintiff is a genuine issue of material fact for the jury to determine. Viewing the evidence in the light most favorable to the nonmoving party, however, would require the district court to find that Meyer hired Holdyk to replace Plaintiff. Consequently, Plaintiff establishes the final element of her prima facie case and the district court erred in finding that Plaintiff failed to prove a prima facie case of discrimination at the summary judgment stage.[2]

---

[2] While Defendants fail to mention Holdyk's hire at all, they counter Plaintiff's argument that similarly situated non-Asian nurses were treated more favorably. This argument is of no moment because if CCF replaced Plaintiff with someone outside of a protected class, she is not required to prove dissimilar treatment. *See Clayton*, 281 F.3d at 610 (prima facie framework requiring proof that Plaintiff was replaced by someone outside of the protected class *or* similarly situated employees outside of the protected class were treated more favorably). Nonetheless, Plaintiff argues that five other nurses were treated more favorably despite their similarly alleged misconduct. The district court found, ultimately, that there was a difference between those nurses and Plaintiff: they were remorseful for their misconduct, while Plaintiff refused to acknowledge any wrongdoing. Further, the district court found that all of those similarly situated nurses were treated the same as Plaintiff—they were counseled about the incidents and an anecdotal was placed in their employee files. However, the district court erred because it engaged in impermissible fact-finding at the summary judgment stage. Whether the comparable

### b. Legitimate, Non-Discriminatory Reason and Pretext

After Plaintiff proves her prima facie case, the burden shifts to CCF to articulate a legitimate, nondiscriminatory reason for its actions. Once the legitimate nondiscriminatory reason is established, Plaintiff must show that the reason proffered by CCF is merely a pretext for discrimination. "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Maben v. Southwestern Med. Clinic*, 630 F. App'x 438, 443 (6th Cir. 2015) (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

Plaintiff argues that neither patients nor their family members filed a grievance or complaint against her in 2013 or 2014, and that the only written evidence of complaints are notes made by Meyer in Plaintiff's employee file that state that certain patients or family members complained. CCF asserts that it suspended Plaintiff because of an inappropriate interaction with a patient on July 18, 2014. However, while Plaintiff admitted that the interaction with the patient happened, she disputes Defendants' characterization of the incident as her improperly confronting the patient. Plaintiff's version involves the patient asking her whether Plaintiff was in trouble with CCF following the failure to monitor her vital signs, to which Plaintiff answered in the affirmative. (Lee Dep. R. #33-5 at 265) Plaintiff testified that, "the July 18 incident is just turned around and fabricated." (*Id*. at 268-69) Therefore, because of the divergent accounts, a factual question remains concerning whether the reason for her suspension was pretextual despite her admissions.

nurses were similarly situated is a factual question for the jury to decide, just as a jury will have to determine whether Plaintiff's refusal to admit wrongdoing was dispositive in her superiors' decisionmaking.

Additionally, a jury must still consider issues concerning Meyer's comments to Plaintiff regarding retirement, HR's failure to investigate any claims of discrimination, the fact that Meyer suspended Plaintiff, Plaintiff's replacement by someone outside of her protected class, and that similarly situated employees were not suspended for possibly similar conduct in order to make appropriate credibility determinations. Further, the evidence shows that although Plaintiff was suspended for a specific patient complaint after many alleged patient complaints, there were no written complaints against Plaintiff in the record. Thus, a question remains as to whether there was any basis in fact for the actions that led to the suspension and whether Defendants were motivated to constructively discharge Plaintiff based upon race, national origin, or age discrimination and not because of any misconduct committed by Plaintiff. Thus, it was improper for the district court to grant summary judgment in favor of Defendants.[3]

## 2. Retaliation

"The *McDonnell Douglas* burden-shifting framework also applies to retaliation claims." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008) (citing *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 713 (6th Cir. 2007)).

> To make out a prima facie case of retaliation, a plaintiff must establish that: (1) she engaged in activity protected by Title VII;

---

[3] The district court found that even if CCF was incorrect in believing patients had complained about Plaintiff's inappropriate behavior, that it was of no moment because of this court's "honest belief" doctrine. That is, "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Maben*, 630 F. App'x at 443 (quoting *Majewski v. Automatic Data Processing, Inc.*, 247 F.3d 1106, 1117 (6th Cir. 2001)). However, it is disputed whether CCF held an honest belief that patients complained against Plaintiff and thus whether CCF held an honest belief is a factual question for the factfinder to decide that rests upon credibility determinations. Defendants may not simply assert the doctrine to disguise an improperly imposed disciplinary action if the decisionmakers could not have had that belief at the time of their decision. A jury must decide that the belief was indeed honest before a determination of liability may be made, and thus summary judgment was improper.

> (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took an adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action.

*Id.* (citing *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 552-53 (6th Cir. 2002)). "Once the plaintiff has made out a prima facie case, the burden of production shifts to the employer to proffer a legitimate, nondiscriminatory reason for its actions." *Id.* (citing *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008)). "If the employer meets this burden, the burden then shifts to the plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason given by the employer was a pretext for retaliation." *Id.*

The district court assumed that Plaintiff engaged in a protected activity, which the defendants were aware of, but found that there was no adverse employment action. This court has held that the "burden of establishing a materially adverse employment action is 'less onerous in the retaliation context than in the anti-discrimination context.'" *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014) (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595-96 (6th Cir. 2007)). "A materially adverse employment action in the retaliation context consists of any action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Michael*, 496 F.3d at 596 (quoting *Burlington Northern*, 548 U.S. at 60).

The evidence shows that CCF subjected Plaintiff to increased surveillance after making a complaint of discrimination and that she was suspended without pay and told not to return until she was called. A reasonable jury could find that these actions would have dissuaded a reasonable worker from making or supporting a charge of discrimination.

The district court did not address the causal connection element of Plaintiff's prima facie case of retaliation. However, a reasonable jury could find that Plaintiff established a causal

connection between her complaints of discrimination and expressed intention to hire a lawyer and the adverse employment action. "To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Id.* (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)). Further, "in some cases temporal proximity may be sufficient to establish causation." *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009) (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523-26 (6th Cir. 2008)). "In *Mickey*, we held that where an adverse employment action occurs very close in time after an employer learns of protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Id.* (internal alteration and citation omitted).

The evidence, viewed in the light most favorable to Plaintiff, establishes that on April 15, 2014, Plaintiff complained of discrimination. This of course was not her only complaint of discrimination, as her complaints began in 2013 and consistently went uninvestigated. Nonetheless, on April 30, 2014, she was issued a corrective action and PIP. Defendants argue that the decision to issue the corrective action and PIP was made prior to Plaintiff's discrimination complaint and that no matter what protected activity Plaintiff engaged in, Defendants would have still taken the corrective action. However, that is a fact question for a jury to decide. Further, in *Hamilton*, this court held that increased surveillance after a discrimination complaint is sufficient to establish the causal connection element of a prima facie case of retaliation. *Hamilton*, 556 F.3d at 436-37. A reasonable jury could find that the close proximity of the adverse employment action to Plaintiff's discrimination complaints and the

uncontroverted allegations of increased surveillance are significant enough to show a prima facie case of retaliation. Therefore, summary judgment was inappropriate.

A reasonable jury could find that despite Plaintiff's admissions to certain misconduct, Defendants nonetheless retaliated against her, at least in some part, because she complained of discrimination. Furthermore, other similarly situated employees who CCF disciplined for similar alleged conduct were not suspended. While the dissent places great weight on CCF's reasons for suspending Plaintiff, our standard of review requires viewing the evidence in a light most favorable to Plaintiff, and only allows the factfinder to make credibility determinations. As the Supreme Court has stated:

> There are many things sometimes in the conduct of a witness upon the stand, and sometimes in the mode in which his answers are drawn from him through the questioning of counsel, by which a jury are to be guided in determining the weight and credibility of his testimony. That part of every case, such as the one at bar, belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge . . . and, so long as we have jury trials, they should not be disturbed in their possession of it . . . .

*Sartor v. Ark. Nat. Gas Corp.*, 321 U.S. 620, 628 (1944) (quoting *Aetna Life Ins. Co. v. Ward*, 140 U.S. 76, 88 (1891)). Thus, it is for a jury to decide whether CCF's reasons were not only honest, but also whether the proffered reasons were really the impetus for the decision to suspend Plaintiff. Therefore, it was improper for the district court to grant summary judgment in favor of Defendants.

### 3. Aiding and Abetting and State Tort Claims

The district court found that because Plaintiff's discrimination and retaliation claims lacked merit, her claims of negligent retention, supervision, and hiring, intentional infliction of emotional distress, and aiding and abetting also fail. However, because the district court

erroneously granted summary judgment in favor of Defendants, we likewise reverse the judgment on Plaintiff's aiding and abetting and state law tort claims.

### 4. Denial of Motion to Strike and Motion to Compel

#### a. Motion to Strike

"We review the decision to grant or deny a motion to strike for an abuse of discretion, and decisions that are reasonable, that is, not arbitrary, will not be overturned." *Seay v. Tennessee Valley Authority*, 339 F.3d 454, 480 (6th Cir. 2003). Meyer filed a declaration explaining business records that were kept in the regular course of business and were maintained in Plaintiff's employee file. Plaintiff asserted that CCF improperly filed Meyer's declaration after her deposition testimony because the declaration contained facts contrary to her deposition testimony. *See Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986) ("A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony.") However, Plaintiff had the opportunity to address the issue of Meyer's declaration, which came after Meyer's deposition testimony, in her opposition to Defendants' motion for summary judgment. Plaintiff chose not to address the issue until two weeks after filing her opposition. The district court found that even if it considered the motion, it would not be fully briefed until after the final pretrial and trial dates, to which it already ordered there would be no more extensions. This court has held that "[t]he timing of trials and docket control are matters best left to the discretion of the trial court." *Anthony v. BTR Automotive Sealing Systems, Inc.*, 339 F.3d 506, 517 (6th Cir. 2003). The district court's refusal to grant the motion to strike was an exercise in maintaining control of its docket and was not an abuse of discretion, especially when Plaintiff could have moved to strike the declaration at an earlier time. Further, Meyer's declaration is not substantially different from

her deposition testimony, where she asserts that Plaintiff had an inappropriate encounter with a patient.

Plaintiff also argues that Meyer could not have authenticated the business records because she was not personally aware of the incidents surrounding them. However, in *Peak v. Kubota Tractor Corp.*, this court stated that a custodian of records "must simply be familiar with the company's recordkeeping practices." *Peak v. Kubota Tractor Corp.*, 559 F.App'x 517, 522 (6th Cir. 2014) (citing *United States v. Weinstock*, 153 F.3d 272, 276 (6th Cir. 1998)). Thereafter, "the proper approach is to admit the evidence and permit the jury to determine the weight to be given the records." *Id.* at 523 (quoting *United States v. Hathaway*, 798 F.3d 902, 907 (6th Cir. 1986)). Thus, the district court did not abuse its discretion when it admitted the evidence and denied Plaintiff's motion to strike.

### b. Motion to Compel

Lastly, Plaintiff argues that the district court's partial denial of her motion to compel prejudiced her in establishing her discrimination claim and allowed the district court to find that she had not proven a prima facie case of discrimination. "We review a district court's discovery-related rulings under the highly deferential abuse-of-discretion standard." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014). This court "will intervene only if it was an abuse of discretion resulting in substantial prejudice." *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 304 (6th Cir. 2007) (internal citation omitted). As we have held, "district courts have discretion to limit the scope of discovery where the information sought is overly broad or would prove unduly burdensome to produce." *Id.* (citing Fed. R. Civ. P. 26 (b)(2)).

The district court found that production of comparator employee files for all nurses in all three Meyer-supervised units would be unduly burdensome for Defendants but nonetheless granted a random sampling of ten percent of the 80 comparator files Plaintiff sought. This was in addition to her receipt of comparator files for each nurse in her own unit. Plaintiff does not argue that the district court's finding that production would be unduly burdensome was erroneous, but instead argues that the district court prejudiced her case by denying access to comparator evidence and simultaneously ruling that she lacked evidence of discrimination. Plaintiff has not established substantial prejudice in the denial of the motion.

### III. CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's summary judgment decision, **AFFIRM** the district court's motion rulings, and **REMAND** for further proceedings consistent with this opinion.

**McKEAGUE, Circuit Judge, dissenting.** I respectfully disagree with the conclusion that a reasonable jury could find that the Cleveland Clinic Foundation constructively discharged Farley Lee, let alone terminated her. Likewise, I see no genuine dispute as to whether the Clinic disciplined Lee because she made vague discrimination complaints rather than due to her own misconduct. Because Lee has not shown she suffered an adverse action necessary to sustain her discrimination claims or a genuine dispute over whether the Clinic's reasons for its actions are a pretext for unlawful retaliation, I would affirm.

I

The majority provides some factual background, but to explain why summary judgment is proper requires more context. In particular, it requires some knowledge about Lee's history with interpersonal problems at work. In August 2013, Lee's fellow nurses reported to Joselyn Meyer—Lee's boss—that Lee had called a patient a "fat pig" and was not acting "like herself." Meyer discussed this incident with Lee, who now claims that the other nurses concocted the story and actually made the "fat pig" comments themselves. Lee concedes, however, that she called the patient "obnoxious" and left his charts uncompleted. The same month, Lee also offended a supervisor by accusing her, in an emotionally charged exchange, of trying to discharge a patient prematurely. Lee acknowledges that she generally received criticism on how she addressed coworkers.

In November 2013, the Clinic removed Lee as a patient's caregiver after the patient's wife grew upset over how Lee responded to questions about her husband's treatment. Notes in Lee's personnel file indicate that the wife complained that Lee was rude, talked over her, and cut her off when she spoke. The wife was particularly vulnerable as she was receiving

23

chemotherapy treatment herself.[1] Lee claims the wife overreacted but confirms that another nurse reported Lee's interaction with the woman to the Clinic and "made a big story about it[.]" R. 33-3, Lee Dep., 121, PID 1545. Meyer spoke with Lee about the conflict the next day to counsel her on how to handle dissatisfied clients. Meyer's records say that she warned Lee that further incidents with patients might lead to a corrective action.[2]

Lee's 2013 performance review, despite saying positive things about Lee, stated that she came "across as harsh when she interacts with patients and colleagues[.]" R. 33-4. Lee Dep., at 130, PID 1554. Additionally, she received her lowest ratings for her ability to accept constructive feedback. Lee acknowledges that coworkers reported her behavior frequently, but she feels the incidents complained about were "little piddly things[.]" *Id.* at 131–33, PID 1555–57.

With this background in mind, we come to April 10, 2014, when Lee admits she told a patient to prearrange her own medication needs with a doctor because Lee did not have the time to deal with it. Lee sees no problem with how she treated this patient, but a coworker told Meyer that Lee had been pushy and abrasive. Four days later, Lee almost sent a patient into an operation without properly preparing an intravenous medicine mixture. Lee then asked the patient's family to keep her error "discreet" and placed blame at least partially on a nursing student. Lee claims that she only wanted to protect the nursing student's feelings, not to cover up the incident. She admits, however, that another nurse reported the incident to the Clinic differently.

---

[1] Or perhaps the wife's mother was receiving chemotherapy. It is unclear. But the point is the woman was vulnerable.

[2] When asked to confirm the accuracy of Meyer's notes on this meeting, Lee did not dispute them.

The next day, Meyer called Lee into her office to discuss accusations that Lee had been pushy or abrasive with a patient. Lee says she responded by accusing Meyer of age and race discrimination. At the end of April, the Clinic's management issued Lee a corrective action and put her on a performance plan citing the need for her to improve her interpersonal skills with patients and coworkers as well as her ability to accept constructive criticism. Presented with this critique, Lee refused to sign the plan, complained that "she was not appreciated for anything," and told her managers that the Clinic focused "on little problems that the patients should not even be mad about." R. 33-4, Lee Dep., 179-83, PID 1603-07.

On July 14, 2014, while under her performance plan, Lee was responsible for monitoring a patient with an abdominal aortic aneurysm. If such an aneurysm were to rupture, the patient must undergo an emergency surgery which only twenty percent of patients survive.[3] Due to the potential risks posed by aortic aneurysms, nurses caring for a patient with this condition must monitor the patient's blood pressure closely. As Lee knew from her training, the Clinic required nurses to notify a doctor immediately if the blood pressure rose above a certain level. At around 10:00 a.m., Lee recognized that her patient registered above this critical point, yet she only reached a doctor about three hours later. Lee blames a secretary for the error.

On Friday, July 18, the Clinic issued Lee a second corrective action, citing this incident and yet another from April where she had mismanaged lab results. She refused to sign this corrective action as well. Lee then undisputedly discussed her discipline with the very aneurysm patient to whom she provided substandard care, telling the patient that she may be terminated for the incident. After the Clinic heard reports that Lee confronted the patient, Meyer suspended

---

[3] A.D.A.M. Medical Encyclopedia [Internet]. Atlanta (GA): A.D.A.M., Inc.; ©2016. Abdominal Aortic Aneurysm; reviewed 2015 Aug 13; page last updated 12/02/2016. Available from: https://medlineplus.gov/ency/article/000162.htm

Lee for three days pending an investigation. Before Lee served any of her suspension, she resigned.

## II

My first disagreement with the majority lies with its decision to resurrect Lee's discrimination claims. Under both Title VII and the ADEA, Lee must show that she suffered an "adverse employment action." *Mensah v. Michigan Dep't of Corr.*, 621 F. App'x 332, 334 (6th Cir. 2015) (citations and quotation marks omitted); *see Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004). That is, some action by her employer that constitutes "a materially adverse change in the terms of" her employment. *Kocsis v. Multi-Care Management Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). Events like "[t]ermination, decrease in wage or salary, change in title, diminished material responsibilities, or a material loss of benefits" all count. *Id.*

The majority sees two possible adverse actions here. First, it thinks a jury could find that Meyer fired Lee. Second, it believes a jury could find that the Clinic intentionally created a harassing environment to force Lee out. The evidence supports neither theory.

## A

To start, the majority unreasonably construes unambiguous facts to find a dispute as to whether the Clinic terminated Lee. Maj. Op. at 9. For the majority, a dispute apparently arises because Lee characterized Meyer as saying "Never come back to work again until I call for you," or "Don't make yourself known in the CCF main campus or go to your locker ever." R. 35-5, 284, PID 1750. Our question on summary judgment, however, is not whether an isolated phrase from a deposition supports an argument when presented without context. Instead, we ask whether a plaintiff produced sufficient evidence to permit a reasonable jury to find for her on a claim's element. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (holding that there is no *genuine* issue "for trial unless there is sufficient evidence favoring the nonmoving

party for a jury to return a verdict for that party") (citations omitted).  Here, Meyer undisputedly prefaced her comments with an unequivocal statement that Lee was suspended for three days pending an investigation.[4]  Further, Lee undisputedly sent the Clinic a signed resignation letter after this conversation.

A termination is not a premonition or a subjective feeling that an employee gets from an interaction with her supervisor.  Rather, it is a discrete event that ends a legal relationship.  *See Termination of Employment*, Black's Law Dictionary (10th ed. 2014) ("The complete severance of an employer-employee relationship.").  To terminate the relationship, a party must manifest its intent in a way that an objective listener would understand as ending that relationship.  *Cf.* Barbara T. Lindemann, Paul Grossman & C. Geoffrey Weirich, Employment Discrimination Law 21.IV.A (Bloomberg BNA, 5th ed. 2012) ("Normally, it is obvious whether a discharge has occurred: Has the employer affirmatively extinguished the employment relationship, or not?").  Lee must present sufficient evidence to permit a reasonable jury to find Meyer manifested an intent to affirmatively extinguish and completely sever Lee's relationship with the Clinic.

Lee simply has not presented such evidence.  We do not need to resolve a he-said, she-said dispute to see the answer here.  Meyer undisputedly told Lee that she was suspended for three days pending a full investigation.  The Clinic's internal emails even refer to Lee as "suspended."  It would be truly odd to find that Meyer, despite her use of the word "suspended," nevertheless objectively manifested an intent to "completely sever" the employment relationship.  No reasonable person could make that inference.

---

[4] It requires no impermissible inferences, only common sense, to understand the import of any comment Meyer made about "never" returning to the campus in this context.  Any troublemaker suspended from school is routinely subject to the same kind of restriction during their suspension.

In fact, there is no evidence anyone actually drew that inference. Lee did not. She undisputedly sent the Clinic a signed resignation letter that purported to be effective the day before her suspension started—bizarre behavior for someone who thought herself "fired." Tellingly, even the majority exposes how contrived this "dispute" is, as it cannot help but refer to Lee as having "resigned" throughout its opinion. *See* Maj Op. at 4, 12, 13. Lee's testimony arguably supports—*at most*—that she had a subjective belief about *future* termination. But the word "reasonable" loses all meaning when the majority asserts that a "reasonable" jury could infer that Meyer terminated Lee.

B

Perhaps hardly expecting that the court would buy her actual-termination argument given that *she sent the Clinic a signed resignation letter*, Lee also contends that the Clinic constructively discharged her. She relies on two strands of constructive-discharge case law for alternative arguments. The first strand she misconstrues, and the second sets a bar for mistreatment that she simply cannot meet on the facts presented. The district court correctly found that no genuine dispute exists in relation to either argument.

Lee first says that because she "reasonably believed" her suspension would end in termination, the Clinic constructively discharged her. She points to case law saying that a constructive discharge could have occurred where a plaintiff resigned with "the understanding that he did not have the option of continued employment." *See Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1128 (6th Cir. 1998). That is, "when the employee reasonably believed his termination to be imminent." *Harris v. Butler Cty., Ohio ex rel. its Sheriff's Dep't*, 344 F. App'x 195, 199 (6th Cir. 2009) (describing *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 554 (6th Cir. 2002)).

But as with her actual-termination argument, Lee merely presents quotes without context. We have used these constructive-discharge formulations she cites in cases where an employer pushes financial pressure points to coerce an employee into retiring. *See Scott*, 160 F.3d at 1127 (finding that a constructive discharge would occur if a company coerced an employee to retire by offering him either (1) voluntary retirement with benefits, a lump sum, and retirement payments or (2) an involuntary lay off without benefits and an only illusory chance to be rehired); *Ford*, 305 F.3d at 554 (holding that where a plaintiff faced an escalating disciplinary campaign and heard he would be fired if he "sneezed," the company could foresee he would retire to keep his pension).

These cases comport with the general understanding that a constructive discharge occurs when an employer intentionally makes work "intolerable." *See Wright v. Illinois Dep't of Children & Family Servs.*, 798 F.3d 513, 528–29 (7th Cir. 2015) (comparing and contrasting Seventh Circuit cases under an analogous strand of constructive-discharge case law). But "a working condition does not become intolerable or unbearable merely because a 'prospect of discharge lurks in the background.'" *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (quoting *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333 (7th Cir. 2004)). And Lee has not presented any evidence of a financially coercive scheme that made quitting profitable for her.

Instead, Lee wants these cases to say that she could quit because she felt that her discipline was a farce that would inevitably lead to her termination. The case law, however, rejects the proposition that an employee can short circuit an employer's disciplinary procedures and then litigate whether the outcome would have been preordained. *See Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002) (rejecting the argument that "termination would have been the

inevitable result" of a performance plan); *Cigan*, 388 F.3d at 333–34 (rejecting the argument that "a notice of intent to commence a process leading to discharge may be treated, at the employee's election, as a completed discharge"). As the Seventh Circuit explained in rejecting an argument like Lee's, "[t]he only way to know how matters will turn out is to let the process run its course." *Cigan*, 388 F.3d at 333. Litigation where parties speculate over what *may* have happened is a poor substitute for the employer's actual processes and a concrete decision. *See id.* at 333–34.

The majority's analysis on Lee's other purported adverse actions seems instructive on this point too. The majority correctly concludes that Lee cannot rely on an unpaid suspension that she never served to show an adverse action. Maj. Op. at 13. And it reaches this result by citing the principle that an employee "is obliged not to assume the worst, and not to jump to conclusions too fast." *Id.* (citing *Agnew*, 286 F.3d at 310 (quoting *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987)). Then, it observes that in this instance Lee "*resigned* before she could serve the suspension." Maj. Op. at 13 (emphasis added).

The same reasoning applies to Lee's constructive-discharge argument. Lee admits that Meyer told her she was suspended pending investigation of reports that Lee confronted the aneurysm patient about Lee's second corrective action. Lee did not have the option to quit and then litigate whether the Clinic would have ignored an investigation that could have potentially exonerated her. Allowing her to do so is to endorse unbridled speculation.

With respect to the second strand of cases, Lee's facts simply do not show the level of mistreatment necessary to qualify as a constructive discharge. "To demonstrate a constructive discharge, the plaintiff must show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person; (2) the employer did so with the intention of forcing the employee to quit; and (3) the employee actually quit." *Hurtt v. Int'l Servs., Inc.*,

627 F. App'x 414, 420 (6th Cir. 2015). We look to various factors to establish whether a reasonable person felt compelled to resign. *See Logan v. Denny's, Inc.*, 259 F.3d 558, 569 (6th Cir. 2001) ("(1) demotion, (2) reduction in salary, (3) reduction in job responsibilities, (4) reassignment to menial or degrading work, (5) reassignment to work under a younger supervisor, (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation, or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status") (citation omitted).

Contrary to the majority's analysis, the comments excerpted in *Logan* do not set some "offensiveness threshold" that makes harassing comments actionable as a constructive discharge. *See* Maj. Op. at 11. To start, the employee in *Logan* allegedly faced more than comments—her employer allegedly demoted her, reduced her salary, and reassigned her to demeaning work after beckoning her to the office with a fake assignment meant to mock her. *See generally Logan*, 259 F.3d 558. Moreover, the employee in *Logan* faced multiple racially abusive incidents over a two-month stint in her new location with a company that the court deemed notoriously abusive. *See generally id.*

Rather than asking whether coworkers' statements meet some *Logan* threshold, the proper threshold question in a constructive discharge case based on harassment is whether the plaintiff has shown mistreatment that rises to the level of a hostile work environment. *See Pennsylvania State Police v. Suders*, 542 U.S. 129, 146–47 (2004). In *Suders*, the Supreme Court analyzed a claim that coworkers' harassment and hostility subjected an employee to a constructive discharge. *Id.* It noted that for an "atmosphere of sexual harassment or hostility to be actionable" alone, "the offending behavior must . . . alter the conditions of the victim's employment and create an abusive working environment." *Id.* (citations and quotation marks

31

omitted). Then, the Court added that a constructive discharge claim based on harassment "entails something more" than even a hostile-work environment claim: "working conditions so intolerable that a reasonable person would have felt compelled to resign." *Id.*

Thus, if a jury could not find that Lee was subject to a hostile work environment, then it could not find that she suffered a constructive discharge, as the majority contends, based on harassment. *See id.* To be actionable as a hostile work environment claim, harassment must be "severe" and "pervasive." *Ault v. Oberlin Coll.*, 620 F. App'x 395, 400 (6th Cir. 2015). To determine whether treatment qualifies as severe or pervasive, courts "look at all the circumstances including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (citations and quotation marks omitted). As indicated by the terms "severe" or "pervasive," this requires a plaintiff to show serious mistreatment. *See, e.g.*, *Williams v. CSX Transp. Co.*, 643 F.3d 502, 506 (6th Cir. 2011) (holding that a supervisor's isolated comments, while "insensitive, ignorant, and bigoted," did not create a hostile work environment); *Armstrong v. Whirlpool Corp.*, 363 Fed. App'x 317, 327 (6th Cir.2010) (holding that even multiple incidents of "alleged serious racial discrimination" failed to "alter the conditions" of plaintiff's employment).

Here, Lee alleges that Meyer asked her about retirement twice and mentioned her father's retirement—hardly "pervasive" or "severe" harassment. She alleges that a nurse named "Jamie Jameson" once made juvenile, offensive remarks that Lee reported and that younger nurses called her names which she appears to have never reported.[5] The alleged comments, while offensive, lack either the severity or pervasiveness necessary to constitute a hostile work

---

[5] The Clinic says it could not find any employee by the name Jamie Jameson in its records.

32

environment. Moreover, the circumstances do not permit an inference that the Clinic permitted an "intolerable" environment with the intent to force Lee out. At best, the evidence would support a finding that the Clinic responded poorly to comments from "Jamie Jameson." It could not sustain a finding that the Clinic constructively discharged Lee.

III

On her retaliation claims, Lee has advanced insufficient evidence to create a genuine dispute as to whether the Clinic disciplined Lee because of her discrimination complaints. Lee can point to three disciplinary actions after she complained about discrimination: (1) she was subject to a performance plan and received a corrective action; (2) she received a second corrective action; and (3) she received a suspension. For the first incident, the Clinic cites Lee's abrasive treatment of patients and her inability to accept criticism. For the second, it points to her failure to monitor a patient with a serious condition. And for the third, it says it wanted to investigate whether she confronted a patient about her discipline.

To show pretext, Lee can show that the proffered reasons "(1) have no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) [were] insufficient to warrant the challenged conduct." *Maben v. Southwestern Med. Clinic*, 630 F. App'x 438, 443 (6th Cir. 2015) (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). But a retaliation case is "not a vehicle for litigating the accuracy of the employer's grounds" for discipline. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). To show pretext, Lee must "offer some evidence that not only were the employer's reasons false, but that retaliation was the real reason for the adverse action." *Id.* An employer with an honest belief in its reason for discipline, even when ultimately mistaken, is entitled to summary judgment when its belief is

based on particularized facts. *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598–99 (6th Cir. 2007).

Here, Lee admits to misconduct justifying her discipline. Even when she says that the conduct is mischaracterized, she admits others perceived the incidents differently and reported them. With respect to her performance plan, Lee agrees that the incidents the Clinic cites happened. Lee did tell a patient that she should have taken care of her medicine herself and that Lee did not have the time. She also concedes that a fellow nurse reported this interaction to Meyer and described Lee as being "abrasive" and "pushy." Further, she admits to a tense exchange with a patient's family four days later in which they accused her of blaming her errors on a nursing student. After this, she admits to asking them to keep the error "discreet" and that a fellow employee tattled on her. Whether a jury might have believed her story that she actually acted prudently in each instance seems irrelevant. She confirms the statements the Clinic heard about, and the perception others had about these interactions. The Clinic had information that gave it legitimate concerns about her behavior.

That the Clinic issued this performance plan to Lee after her discrimination complaint to Meyer and the Clinic's human resource department creates no genuine dispute here. Proximity means little when an employee levels the accusation in response to potential discipline. *See, e.g.*, *Beard v. AAA of Michigan*, 593 F. App'x 447, 451 (6th Cir. 2014) ("An employee cannot allege discrimination like a protective amulet when faced with the possibility that his preexisting disciplinary problems could lead to his termination"); *Hervey v. County of Koochiching*, 527 F.3d 711, 723 (8th Cir. 2008) ("Insubordinate employees may not insulate themselves from discipline by announcing an intention to claim discrimination just before the employer takes action."). Lee undisputedly levelled her accusations after being asked by Meyer to discuss

reports that she was pushy and abrasive with a patient. And this came after Meyer had already discussed Lee s behavior with her in November and warned that she might issue Lee a corrective action in the future.

Moreover, the thrust of the Clinic's concerns—Lee's interpersonal skills with patients and coworkers and inability to accept criticism—hardly seem like contrivances. In fact, the record shows a common theme running through every incident where Lee faced discipline. Lee even responded to the criticism in her performance plan by telling the Clinic that she "wasn't appreciated for anything" and that management cared about things that patients "should not even be mad about."

As to the second supposedly retaliatory act, the second corrective action, Lee likewise shows no evidence undercutting the Clinic's honest belief in its reasons or showing them to be pretextual. Lee admits that she failed to alert a doctor to the aneurysm patient on time. Consistent with the criticism in her performance plan, Lee deflects blame to this day and shifts responsibility for the incident on to a secretary. The second corrective action was precipitated by undisputed facts and seems wholly warranted given the error's gravity and Lee's earlier placement on a performance plan.

The last allegedly retaliatory incident adds little for Lee's case. She admits that she discussed her discipline with the patient. She concedes that she told the patient that she thought she might be terminated over the incident. Whether the patient initiated this contact with Lee or, as Lee claims, actually offered Lee moral support matters little. The Clinic had reports that Lee aired her grievances to the patient and suspended her to investigate whether she actually did. The Clinic undisputedly had a basis to investigate this incident.

Finally, Lee's comparator evidence affords little support for a finding that the Clinic's stated concerns were merely a pretext for unlawful retaliation. As the district court found, Lee faced discipline similar to that imposed on her supposed comparators. *See Lee v. The Cleveland Clinic Found.*, No. 1:15 CV 91, 2016 WL 29226, at *10 (N.D. Ohio Jan. 4, 2016). And no comparators presented the sort of persistent problems with their bedside manner or the insolence when confronted with their problems that Lee displayed. Giver her track record, it comes as no surprise, and seems entirely reasonably, that Lee's discipline continued to escalate. I see no genuine dispute as to whether the Clinic meant to punish her for conclusory discrimination complaints.

## IV

Although the majority aims to apply the summary-judgment standard evenhandedly, it ends up merely accepting that genuine disputes exist because Lee claims they do. As a result, Lee is permitted to invoke the federal judicial machinery to pursue her various workplace grievances based on pure speculation that her age, race, or any protected activity was a motivating factor. I dissent.